# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Sharon Denise Brailsford, | ) | C/A No.: 1:18-321-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Terry L. Wooten, United States District Judge, dated February 23, 2018, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff filed this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she

applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On March 25, 2014, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on February 8, 2009. Tr. at 194–204. Her applications were denied initially and upon reconsideration. Tr. at 108–12, 114–19. On February 28, 2017, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Brian Garves. Tr. at 32–66 (Hr'g Tr.). The ALJ issued an unfavorable decision on April 11, 2017, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 15–31. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 6, 2018. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 44 years old at the time of the hearing. Tr. at 60. She completed high school. *Id.* Her past relevant work ("PRW") was as a machine

operator, machine cleaner, and deburrer. Tr. at 40–44. She alleges she has been unable to work since February 28, 2009. Tr. at 194.

2. Medical History

Plaintiff presented to the emergency room ("ER") at Regional Medical Center ("RMC") on April 18, 2012, with complaints of flu-like symptoms. Tr. at 398. Plaintiff also indicated she had been unable to obtain her diabetes medication. *Id.* The attending physician diagnosed bronchitis and discharged Plaintiff with prescriptions for Azithromycin, Tessalon Perles, and Metformin. Tr. at 401.

Plaintiff presented to the ER at RMC on August 16, 2012, with complaints of intermittent left flank pain and elevated blood glucose levels due to an inability to refill medication. Tr. at 371. The attending physician diagnosed uncontrolled non-insulin dependent diabetes, hyperglycemia, and myalgia of left flank area, and he discharged Plaintiff with prescriptions for Glucophage and potassium chloride. Tr. at 378.

Plaintiff presented to Alan Huellmantel, M.D. ("Dr. Huellmantel"), on May 22, 2013, complaining of right knee pain, chest pain, and intermittent left-hand tingling and numbness. Tr. 424. Dr. Huellmantel diagnosed hypersecretory gastropathy, diabetes mellitus, and localized primary osteoarthritis of the right knee. *Id.*

Plaintiff reported right knee pain and swelling to James P. Marro, M.D. ("Dr. Marro") on May 29, 2013. Tr. at 317–18. He noted good range of motion ("ROM") with mild effusion and exquisite tenderness over the medial joint line. *Id.* He assessed arthritis and explained Plaintiff's obesity was a significant factor. Tr. at 319. He noted Plaintiff was not a candidate for steroid injections due to her uncontrolled blood glucose levels, but stated he would re-evaluate once Plaintiff's diabetes was better controlled. *Id.*

Plaintiff followed up with Dr. Marro on September 18, 2013, reporting her right knee was still painful and her blood glucose levels were not controlled. Tr. at 320. Dr. Marro assessed degenerative joint disease and prescribed Daypro. Tr. at 321.

Plaintiff returned to Dr. Marro on February 25, 2014, with complaints of continued right knee pain. Tr. at 322. She noted Daypro provided some relief, but did not last all day. *Id.* Dr. Marro observed pain and crepitus with ROM, mild effusion, and significant tenderness over the medial joint line. *Id.* Dr. Marro assessed arthritis and noted Plaintiff had symptoms of peripheral neuropathy needing further evaluation. *Id.*

State agency medical consultant Jean Smolka, M.D. ("Dr. Smolka"), reviewed the record on September 26, 2014, and determined the evidence was insufficient to determine the severity of Plaintiff's impairments. Tr. at 79. Dr. Smolka determined Plaintiff was not disabled. Tr. at 81.

Plaintiff presented to Kevin L. Ray, DPM ("Dr. Ray), on October 1, 2014, with complaints of heel pain. Tr. at 435. Dr. Ray observed pain on palpation on the plantar medial calcaneal tuber of the left heel. *Id.* X-rays and ultrasound indicated calcaneal spur and inflammation at the insertion of the plantar fascia. *Id.* He assessed plantar fasciitis, diabetes, and calcaneal spur, and administered injection therapy with Lidocaine, Marcaine, and Dexamethasone. *Id.*

Plaintiff presented to Stephen Keen, PA-C ("Mr. Keen"), on October 14, 2014, with complaints of poorly-controlled diabetes and intermittent right knee pain, stable with over-the-counter NSAIDS. Tr. at 446. Mr. Keen assessed non-complicated, uncontrolled diabetes mellitus and unspecified osteoarthrosis. Tr. at 447.

Plaintiff followed up with Dr. Ray on October 22, 2014, with complaints of heel pain. Tr. at 434. She reported she still had discomfort. *Id.* An ultrasound indicated inflammation at the insertion of the plantar fascia. *Id.* Dr. Ray assessed plantar fasciitis and calcaneal spur and discussed treatment options. *Id.*

Plaintiff was examined by Monnieque Singleton, M.D. ("Dr. Singleton"), on October 28, 2014, for a follow-up on diabetes mellitus and Plaintiff's report of pain in her finger tips and toes. Tr. at 443. Dr. Singleton assessed

uncontrolled diabetes mellitus and polyneuropathy, refilled Metformin, and prescribed Levemir, Glimepiride, and Neurontin. Tr. at 444.

Plaintiff followed up with Dr. Ray for complaints of heel pain. Tr. at 459. On November 19, 2014, Dr. Ray discussed treatment options and prescribed Medrol and a night splint. *Id.* On December 11, 2014, Plaintiff reported the night splint provided some relief, but she continued to have discomfort. Tr. at 460. Dr. Ray administered injections. *Id.* On January 8, 2015, Plaintiff reported the injections were not helpful and she was still experiencing pain. Tr. at 461. Dr. Ray and Plaintiff discussed surgical and non-surgical options, and he advised Plaintiff to continue stretching. *Id.*

A second state agency medical consultant, George Walker, M.D. ("Dr. Walker"), reviewed the record on January 9, 2015. He determined Plaintiff's medical conditions did not result in significant limitations in her ability to perform basic work activities and were not severe enough to be considered disabling. Tr. at 104–105.

On January 12, 2015, Plaintiff presented to Margaret Beth Grossman, D.O. ("Dr. Grossman"), seeking medical clearance for left foot surgery. Tr. at 493. Dr. Grossman noted an abnormal electrocardiogram ("ECG") and referred Plaintiff for additional cardiac evaluation. Tr. at 494. Plaintiff followed up with Lauren Murphy, P.A. ("Ms. Murphy"), on January 30, 2015.

Tr. at 490. Ms. Murphy noted Plaintiff's repeat ECG was normal and cleared her for surgery. Tr. at 490–91.

On February 2, 2015, Plaintiff presented to RMC for surgical consultation. Tr. at 568. The attending physician cleared Plaintiff for surgery and adjusted Plaintiff's medication to address her uncontrolled diabetes. *Id.* Plaintiff followed up with Dr. Ray on February 4, 2015. Tr. at 460. Plaintiff reported she was ready for surgical correction and, after reviewing Plaintiff's medical records, Dr. Ray scheduled surgery. *Id.*

On February 6, 2015, Plaintiff was admitted to RMC for an endoscopic plantar fasciotomy and calcaneal ostectomy performed by Dr. Ray. Tr. at 506. Plaintiff was discharged with no complications. *Id.*

On March 25, 2015, Plaintiff reported to Advanced Diagnostic Imaging Center for imaging of both knees. Tr. at 454. Leland D. Cropper Jr., M.D. ("Dr. Cropper"), indicated imaging of left knee was normal and imaging of right knee revealed mild osteoarthritis in the medial compartment. Tr. at 454–55.

On April 2, 2015, Plaintiff returned to Dr. Ray. Tr. at 464. Plaintiff reported burning in the bottom of her feet that she attributed to elevated blood glucose levels. *Id.* Dr. Ray assessed neuritis and prescribed topical creams. *Id.*

On April 30, 2015, Plaintiff presented to Dr. Ray with complaints of heel pain. Tr. at 465. Plaintiff reported she was doing better, but continued to experience mild discomfort. *Id.* Dr. Ray noted an ultrasound indicated minimal inflammation of the left heel. *Id.* He discussed with Plaintiff her post-operative course and advised her to continue stretching and icing. *Id.*

On July 8, 2015, Plaintiff presented to Dr. Marro. Tr. at 607. She reported right knee pain and intermittent swelling with ambulating and bending. *Id.* Plaintiff indicated ibuprofen provided limited relief and requested an injection. Tr. at 607, 610. Dr. Marro assessed mild crepitus to range of motion, mild to moderate effusion, and generalized tenderness with palpitation over the medial joint line. Tr. at 609. Dr. Marro discussed risks associated with injection, and Plaintiff indicated a desire to proceed. Tr. at 610. Dr. Marro injected one cc of Triamcinolone, two cc of Lidocaine, and two cc of Marcaine into Plaintiff's right knee. *Id.*

On October 21, 2015, Plaintiff followed up with Ms. Murphy regarding her diabetes mellitus and medication refills. Tr. at 485. Plaintiff reported fluid accumulation in her legs. Tr. at 485–86. Ms. Murphy assessed type 2 diabetes with hyperglycemia and mixed hyperlipidemia. Tr. at 486. On November 11, 2015, Plaintiff presented to Ms. Murphy, who referred her to a healthy living center for her morbid obesity, uncontrolled diabetes mellitus, and hyperlipidemia. Tr. at 482–83.

On November 24, 2015, Plaintiff presented to Dr. Marro complaining of right knee pain. Tr. at 614. Plaintiff reported she had a few months' relief from injections, but her pain had returned. *Id.* Dr. Marro observed mild effusion, tenderness to palpation over the medial joint line, and discomfort with range of motion. Tr. at 615. Dr. Marro assessed arthritis and right knee pain and administered an injection. *Id.*

On March 17, 2016, Plaintiff presented to RMC for a lower extremity arterial study including doppler evaluation and bilateral pulse volume recordings. Tr. at 521. The impression was an essentially normal exercise study of both lower extremities. *Id.*

Plaintiff followed up with Dr. Marro on April 27, 2016, reporting two months of relief from injections. Tr. at 619. Dr. Marro observed anteroposterior ("AP") and lateral radiographs of right knee demonstrated medial joint space narrowing. *Id.* Dr. Marro administered a repeat injection. Tr. at 622.

From May 18 to July 23, 2016, Plaintiff presented to RMC for physical therapy for decreased mobility and pain associated with osteoarthritis of her right knee. Tr. at 582. On May 18, 2016, physical therapist Ronika M. Robinson ("Ms. Robinson") performed an initial evaluation. *Id.* Ms. Robinson observed ROM within functional limitations, but limited in Plaintiff's lower right extremity and noted Plaintiff independently ambulated 1000 feet. Tr. at

583–84. On May 25 and June 6 and 8, 2016, Plaintiff presented for physical therapy. Tr. at 580. Plaintiff reported a decrease in pain at the end of each session. Tr. at 573–75, 577. Plaintiff was encouraged to comply with her home exercise program. Tr. at 577.

On June 1, 2016, Plaintiff followed up with Ms. Murphy for her diabetes mellitus. Tr. 477. Ms. Murphy adjusted Plaintiff's medication to obtain better control of her diabetes. *Id.*

On August 24, 2016, Plaintiff presented to Dr. Marro complaining of increased right knee pain. Tr. at 625. Dr. Marro noted Plaintiff failed conservative therapy and was requesting a total knee arthroplasty. *Id.* Plaintiff reported she was not able to perform her normal activities because of pain. *Id.* Dr. Marro observed AP and lateral radiographs of right knee in weightbearing position indicated mild varus deformity with narrowing medial joint space and osteophyte formation. *Id.* Dr. Marro noted ROM was met with discomfort. *Id.* Dr. Marro discussed surgical risks and informed Plaintiff she would likely need a revision in the future. *Id.* Plaintiff consented to the procedure and Dr. Marro scheduled the arthroplasty and referred Plaintiff to a cardiologist for preoperative optimization and evaluation. Tr. at 627.

Plaintiff presented to Dr. Marro on September 14, 2016, for a pre-operative consultation. Tr. at 634. Plaintiff reported she could no longer

perform her normal activities because of discomfort. *Id.* Dr. Marro reviewed AP and lateral radiographs of Plaintiff's right knee in weightbearing position and noted medial joint space narrowing with osteophytes. Tr. at 636. He further noted mild subluxation of the tibia. *Id.* He discussed surgical risks with Plaintiff and explained the radiographs did not demonstrate severe arthritis. *Id.* Dr. Marro indicated he would obtain another Magnetic Resonance Imaging ("MRI") prior to surgery. *Id.*

On September 21, 2016, Plaintiff presented to RMC Center for an MRI of her right knee. Tr. at 546. Plaintiff also followed up with Dr. Marro, who reviewed the MRI, noting degenerative changes in the medial compartments and significant meniscal pathology. Tr. at 549. Dr. Marro elected to proceed with an arthroscopy of the right knee with repair or resection of damaged tissue. Tr. at 549, 551.

On September 26, 2016, Plaintiff was admitted to RMC where Dr. Marro performed a right knee arthroscopy. Tr. at 556. Plaintiff tolerated the procedure well and was discharged with instructions to bear weight as tolerated. *Id.*

On October 12, 2016, Plaintiff followed up with Dr. Marro. Tr. at 639. Plaintiff reported she was doing well and was experiencing improvement. *Id.* Dr. Marro noted healed surgical incisions and good ROM. Tr. at 640. He prescribed Ultram for discomfort. *Id.*

On November 7, 2016, Plaintiff presented to Lucius Craig III, M.D ("Dr. Craig"), for a follow-up on her right knee scope. Tr. at 643. Plaintiff reported experiencing pain at night and when walking longer distances and noted her pain was relieved with rest. *Id.* Dr. Craig noted tenderness to palpitation along the medial aspect of Plaintiff's right knee, positive crepitus, and ROM of 0/0/100 degrees. Tr. at 646. He assessed primary osteoarthritis of the right knee and instilled one ml of Kenalog 40 and three ml of 1% lidocaine without epinephrine into Plaintiff's right knee. *Id.*

On December 9, 2016, Plaintiff followed up with Ms. Murphy and reported bilateral knee pain. Tr. at 472. Ms. Murphy referred Plaintiff to an orthopedist. Tr. at 473.

On December 21, 2016, Plaintiff was examined by Dr. Craig. Tr. at 649. Plaintiff reported her knee pain was not as severe, but was exacerbated by movement and relieved by analgesics. *Id.* Dr. Craig noted Plaintiff's gait was within normal limits and assessed right knee with moderate tenderness and diminished ROM and left knee with mild tenderness over patellar tendon with palpitation and normal ROM. Tr. at 650. He diagnosed arthroscopic surgery of right knee and patellar tendonitis, progressing as expected. Tr. at 651.

On February 8, 2017, Plaintiff followed up with Dr. Craig. Tr. at 659. Plaintiff reported the right knee injection did not significantly alleviate her

pain and requested a left knee injection. *Id.* Dr. Craig assessed ROM of bilateral knees at 0/1/110 with medial joint tenderness. Tr. at 662. He diagnosed primary osteoarthritis. *Id.* He noted Plaintiff failed conservative management and based on Plaintiff's report that her condition affected her activities of daily living he would schedule her for a right total knee replacement. *Id.* He administered a repeat injection. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on February 28, 2017, Plaintiff testified she was a machine operator, machine cleaner, and deburrer. Tr. at 40–45. Plaintiff testified she had right knee surgery approximately four months prior which exacerbated her knee pain. Tr. at 45. Plaintiff stated she had a thumping pain in her right knee and she would elevate her right leg 15–30 minutes and use an ice pack throughout the day to alleviate her knee pain. Tr. at 47, 49, 54–55. Plaintiff testified she occasionally utilized a cane when she was required to do a lot of work, and she sometimes wore a brace or banded her knee. Tr. at 47–48. Plaintiff testified she also had problems with her left knee, but with injections, the pain was not constant, but it increased when she walked. *Id.* at 48. Plaintiff testified she had left heel surgery and the burning and pain she experienced had improved. Tr. at 48–49.   Plaintiff

stated her feet burned and she experienced a pulling sensation when she stood and walked. Tr. at 49. Plaintiff testified her doctor prescribed pain medication that alleviated the pain, but resulted in mood swings. Tr. at 49, 51. Plaintiff testified she could sit for 15 minutes, stand for less than 15 minutes, dress herself and take short showers with only occasional assistance, lift eight pounds, and drive short distances. Tr. at 51–54. Plaintiff stated her blood sugar levels fluctuated and she experienced pain when her blood sugar was elevated and dizziness when it was low. Tr. at 51, 56.

### b. Vocational Expert Testimony

Vocational Expert ("VE") Rebecca Bruce reviewed the record and testified at the hearing. Tr. at 58. The VE categorized Plaintiff's PRW as a CNC machine operator, *Dictionary of Occupational Titles* ("*DOT*") number 649.685-070, as medium with a specific vocational preparation ("SVP") of three, burring parts, *DOT* number 372.667-018, light with an SVP of 2, sanitizing machinery, *DOT* number 381.687-018, medium with an SVP of 2, and assembling, *DOT* number 780.684-062, light with an SVP of 2. Tr. at 60. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight hour shift, and stand or walk for six hours in and eight hour shift; occasional foot control with right foot; occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, frequently balance and stoop,

and occasionally kneel and crouch, but never crawl; have occasional exposure to unprotected heights and moving machinery; and was limited to simple routine tasks. Tr. at 60. The ALJ asked the VE if an individual with these limitations could perform Plaintiff's PRW as it was actually performed and as it was customarily performed per the *DOT*. Tr. at 61. The VE testified that the hypothetical individual could do Plaintiff's PRW as described in the *DOT* and as performed. *Id.* The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified rental clerk for storage, *DOT* number 294.367-026, light with an SVP of two, ticket puller, *DOT* number 221.687-014, light with an SVP of 2, and mail clerk, *DOT* number 209.587-026, light with an SVP of 2. *Id.* The VE testified there was 57,972 jobs, 317,647 jobs, and 102,906 jobs available in the national economy, respectively. *Id.*

For a second hypothetical, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in the first hypothetical, but was further restricted to lifting no more than 10 pounds, with occasional lifting or carrying, and needed to alternate standing for up to 10 minutes after 30 minutes of sitting. Tr. at 61–62. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 62. The ALJ asked whether there were any other jobs in the national economy that the hypothetical person could perform. *Id.* The

VE identified unskilled and sedentary jobs, SVP 2 of order clerk, *DOT* number 209.576-014, charge account clerk, *DOT* number 205.367-014, and surveillance monitor, *DOT* number 379.367-010. *Id.* The VE testified there was 172,760 jobs, 102,606 jobs, and 54,800 jobs available in the national economy, respectively. *Id.* The VE affirmed his testimony was in accordance with the *DOT. Id.*

Plaintiff's attorney asked the VE to consider an individual of Plaintiff's vocational profile, as limited by the first and second hypotheticals, who also required a 15 to 30 minute break to elevate her feet above hip level. Tr. at 63. The VE responded that the individual would be unable to perform any jobs. *Id.* Plaintiff's attorney then asked the VE to consider an individual of Plaintiff's vocational profile, as limited by the second hypothetical, who needed to change positions from sitting to standing every 15 minutes. *Id.* The VE responded that individual would be able to perform the jobs listed in response to the second hypothetical. *Id.* Plaintiff's attorney then asked the VE to consider an individual who was limited to six-hour workdays, and the VE responded the individual would be unable to perform any job. *Id.*

2.    The ALJ's Findings

In his decision dated April 11, 2017, the ALJ made the following findings of fact and conclusions of law:

16

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2015.

2.    The claimant has not engaged in substantial gainful activity since February 28, 2009, the alleged onset date (20 CFR 404.1571 et seq. and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: obesity, knee disorders, left foot disorders and diabetes with peripheral neuropathy (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Claimant can lift or carry up to 10 pounds at a time with occasional lifting or carrying of articles such as docket files, ledgers, and small tools. Claimant can sit up 6 hours in an 8 hour workday and stand or walk 2 hours in an 8 hour workday. Claimant requires the ability to stand for 10 minutes after 30 minutes of sitting. Claimant can occasionally operate controls with the left foot. Claimant can occasionally kneel, crouch, climb ramps, and climb stairs, frequently balance and stoop, and never crawl or climb ladders, ropes, and scaffolds. Claimant can tolerate occasional exposure to unprotected heights and moving mechanical parts. Claimant is limited to performing simple, routine tasks.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on July 14, 1972 and was 36 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 4-4.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in

significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 28, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 20–21, 24–25.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ's RFC determination was not supported by substantial evidence because there is no medical opinion in the record; and

2) the ALJ's Step 5 finding was not supported by substantial evidence because the VE's testimony was not consistent with the *DOT* and the ALJ failed to reconcile the VE's testimony with the *DOT* in violation of SSR 00-4p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

18

can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5)

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).
[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant

whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that

---

work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to try these cases de novo or resolve mere conflicts in the evidence. *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Conflict Between VE Testimony and *DOT*

Plaintiff argues the ALJ's step five finding is flawed because he did not resolve a conflict between the VE's testimony and the *DOT*. [ECF No. 14 at 15]. She argues the jobs identified by the VE required a general educational development ("GED") reasoning level of three, which conflicted with the restrictions in the RFC assessment. *Id.* at 15–16. She maintains the ALJ improperly relied on the VE's erroneous testimony that no conflict existed between her testimony and the *DOT*. *Id.* at 16–17.

The Commissioner argues the RFC assessment did not conflict with GED reasoning level three because Plaintiff was not restricted to one-to two-step instructions and had recently completed college courses. [ECF No. 15 at

7]. She contends the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has not addressed in a precedential decision[3] whether a GED reasoning level of three is incompatible with the ability to perform simple and routine tasks. *Id.* at 8. She argues courts are divided whether an apparent conflict exists between an RFC for simple, routine, and repetitive tasks and a GED reasoning level of three, and she urges the court to follow the Third, Ninth, and Tenth Circuit Courts of Appeal that have found no conflict. *Id.*

At step five in the sequential evaluation process, "the Commissioner bears the burden to prove that the claimant is able to perform alternative work." *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015), citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The Social Security Administration ("SSA") relies primarily on the *DOT* for information about the requirements of work in the national economy, and ALJs should take administrative notice of information contained therein and consider it in assessing claimants' abilities to perform specific jobs. 20 C.F.R. § 404.1566(d) and § 416.966(d). In some cases, ALJs obtain testimony from VEs to address more complex issues, such as whether claimants' work skills can be used in other work and specific

---

[3] "[U]npublished opinions are not binding precedent in this circuit." *United States v. Ruhe*, 191 F.3d 376, 392 (4th Cir. 1999).

occupations that allow for use of particular skills. 20 C.F.R. § 404.1566(e) and § 416.966(e).

In recognizing that opinions from VEs sometimes conflict with the information contained in the *DOT*, the SSA promulgated SSR 00-4p to explain how these conflicts should be resolved. The "purpose" of SSR 00-4p "is to require the *ALJ* (not the vocational expert) to '[i]dentify and obtain a reasonable explanation' for conflicts between the vocational expert's testimony and the *Dictionary*, and to '[e]xplain in the determination or decision how any conflict that has been identified was resolved.'" *Pearson*, 810 F.3d at 208, citing SSR 00-4p (emphasis in original). Pursuant to SSR 00-4p, "[f]irst, the ALJ must '[a]sk the [vocational expert] . . . if the evidence he or she has provided conflicts with the information provided in the [*Dictionary*]'; and second, '[i]f the [vocational expert]'s . . . evidence appears to conflict with the [*Dictionary*],' the ALJ must 'obtain a reasonable explanation for the apparent conflict.[4]'" *Id.* at 208, citing SSR 00-4p. "SSR 00-4p directs the ALJ to 'resolve the conflict by determining if the explanation given by the [expert] is reasonable'" and "to 'explain the resolution of the conflict *irrespective of how the conflict was identified*.'" *Id.* at 208, citing SSR 00-4p

---

[4] The court explained that an "apparent conflict" exists when the VE's testimony "seems to, but does not necessarily, conflict with the *Dictionary*." *Pearson*, 810 F.3d at 209. ALJs must resolve both obvious and apparent conflicts between the VE's testimony and the *DOT*. *Id.*

(emphasis in original). Thus, "[t]he ALJ independently must identify conflicts between the expert's testimony and the *Dictionary*." *Id.* at 209. Furthermore, "an ALJ has not fully developed the record if it contains an unresolved conflict between the VE's testimony and the *DOT*" and "an ALJ errs if he ignores an apparent conflict on the basis that the VE testified that no conflict existed." *Henderson v. Colvin*, 643 F. App'x 273, 277 (4th Cir. 2016), citing *Pearson*, 810 F.3d at 210.

Pertinent to Plaintiff's argument, the ALJ determined she was limited to performing simple, routine tasks. Tr. at 21. He relied on the VE's testimony to find that Plaintiff could perform jobs as an order clerk, charge account clerk, and surveillance monitor. Tr. at 25.

The *DOT* indicates the jobs of order clerk, charge account clerk, and surveillance-system monitor have GED reasoning levels of three and require the worker to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations." 209.567-014, ORDER CLERK. *DOT* (4th ed., revised 1991), 1991 WL 671794; 105.367-014, CHARGE-ACCOUNT CLERK. *DOT* (4th ed. Revised 1991) 1991 WL 671715; 379.367-010 SURVEILLANCE-SYSTEM MONITOR. *DOT* (4th ed., revised 1991) 1991 WL 673244.

In *Henderson*, 643 F. App'x at 277, the court acknowledged that "there is an apparent conflict between an RFC that limits [a claimant] to one-to-two step instructions and GED reasoning Code 2, which requires the ability to understand detailed instructions." Accordingly, the court found the ALJ failed to meet his burden at step five because the VE's testimony did not provide substantial evidence to show that the plaintiff's RFC would allow him to perform work that existed in significant numbers. *Id.* at 277. This case is similar to *Henderson* in that the RFC assessment limited Plaintiff to "simple" tasks, but it differs from *Henderson* in that the ALJ did not specify that Plaintiff was limited to one- or two-step instructions.

Recently, the Fourth Circuit has considered restrictions similar to the limitation to simple and routine tasks found in Plaintiff's RFC and found an apparent conflict between those restrictions and a GED reasoning level of three. *See Keller v. Berryhill*, No. 17-2248, 2018 WL 6264813 (4th Cir. Nov. 29, 2018) (finding a limitation to short and simple instructions appears inconsistent with jobs that require a GED reasoning development level 3). This court has also reached a similar conclusion in *Christopherson v. Colvin*, No. 6:15-4725-JMC-KFM, 2016 WL 7223283 (D.S.C. Nov. 18, 2016)[5] and *Reid v. Astrue*, C/A No. 6:10-2118-MBS-KFM, 2012 WL 667164 (D.S.C. Feb. 8,

---

[5] Adopted by 2016 WL 7212785 (D.S.C. Dec. 13, 2016).

2012)[6]. The courts in *Christopherson* and *Reid* relied on the Fourth Circuit's holding in *Henderson* and earlier cases in the district to find that an apparent conflict existed between the limitation in the RFC to "simple, routine, and repetitive tasks" and identified jobs with GED reasoning levels of two and three. 2016 WL 7223283 at *9 and 2012 WL 667164 at *12–13.

Although the ALJ questioned the VE regarding the consistency of her testimony with the *DOT* and was informed that the testimony was consistent, *see* Tr. at 25, he did not take the necessary step to independently identify and resolve the apparent conflict between Plaintiff's RFC and her ability to meet the demands of the order clerk, charge account clerk, and surveillance monitor positions. *See Pearson*, 810 F.3d at 208. Accordingly, the undersigned finds the Commissioner failed to meet her burden at step five. To the extent the ALJ argues Plaintiff's recent completion of college courses establishes Plaintiff can meet the mental demands of GED reasoning level 3, the undersigned finds this argument unavailing. The ALJ did not indicate that the restriction to simple and routine tasks was tied to a cognitive impairment, but explained the limitation was made to address Plaintiff's pain issues and blood sugar problems which would be expected to cause problems with concentration. *See* Tr. at 23.

---

[6] Adopted by 2012 WL 663482 (D.S.C. Feb. 29, 2012).

2.      Additional Allegations of Error

Plaintiff argues the ALJ's RFC is not supported by substantial evidence because there is no medical opinion in record. [ECF No. 14 at 11]. She contends the ALJ accorded little weight to the sole medical opinion in the record and therefore impermissibly utilized the raw medical data to create Plaintiff's RFC. [ECF Nos. 14 at 12; 16 at 2]. Because the RFC assessment is to be based on all the relevant evidence in the case record (20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1)), and the undersigned finds that some of the relevant evidence was not adequately considered, the undersigned declines to address Plaintiff's additional allegation of error.

On remand, the ALJ should obtain VE testimony in compliance with SSR 00-4p with respect to any conflict between the reasoning level for the jobs identified by the VE and the limitations imposed by the ALJ in his RFC. The ALJ should also consider Plaintiff's remaining allegations, including but not limited to those issues related to Plaintiff's RFC.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the

undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

    IT IS SO ORDERED.

Shiva V. Hodges

February 13, 2019
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge